# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mad Catz Interactive, Inc., <br><br>  vs.   Plaintiff, <br><br> Razor USA, Ltd., <br><br>    Defendant. | CASE NO. 13cv2371-GPC (JLB) <br><br> **ORDER GRANTING MAD CATZ INTERACTIVE INC.'S MOTION TO MODIFY THE PROTECTIVE ORDER** <br><br> [ECF No. 35] |

This is a patent infringement case. Before the Court is Plaintiff Mad Catz Interactive Inc.'s Motion to Modify the Protective Order (ECF No. 35) filed on May 13, 2014. The Motion seeks to modify the terms of the operative protective order such that attorney Whitney E. Peterson, Mad Catz's General Counsel and lead trial attorney, can review and access documents and information that Defendant Razer USA Ltd. or other parties in this case produced and marked as highly confidential. On May 29, 2014, Defendant Razer filed its Opposition to the Motion. (ECF No. 36.) Then, on June 5, 2014, Plaintiff filed its Reply in support of the Motion. (ECF No. 40.) The Court held oral argument on the Motion on July 10, 2014. (ECF No. 48.) Having considered the arguments and submissions of the parties, the Court hereby **GRANTS** Plaintiff's Motion for the reasons outlined below.

## I. Factual Background

Plaintiff, Mad Catz Interactive, Inc., filed suit against Defendant, Razer USA, Ltd., for patent infringement. Plaintiff holds an exclusive license to, *inter alia*, produce and sell certain computer gaming mice with an adjustable palm rest which fall within the scope of Patent No. 6,175,370 (the '370 Patent). Plaintiff alleges Defendant's "Ouroboros" mouse falls within the scope of this Patent. Defendant counterclaims that Plaintiff infringes on its Patent No. 8,605,063 (the '063 Patent) which covers certain backlighting technology for gaming keyboards.

The Court entered a protective order governing all document production on May 8, 2014. As per the protective order, any documents considered to be most sensitive by the producing party, such as documents reflecting trade secret or other confidential research, development, financial, or other highly sensitive commercial or business information, would be marked "HIGHLY CONFIDENTIAL – DESIGNATED COUNSEL'S EYES ONLY." (ECF No. 34 at 5.) Thus, only "designated counsel" may access and review documents and information marked "highly confidential."

According to the terms of the protective order, Mr. Peterson, Mad Catz's General Counsel and lead trial attorney for this case, has limited access to the documents. The protective order defines who is included as "designated counsel." With respect to Mr. Peterson, the protective order provides that Mr. Peterson is designated counsel, but "only with respect to documents and information produced by third party Humanscale Corporation pursuant to a subpoena issued by Razer USA, Ltd. and not with respect to any documents or information produced by Razer USA, Ltd. or any other third party (unless such other third party agrees that Mr. Peterson may have access to such documents or information)."[1] (ECF No. 34 ¶4.)

---

[1] The Protective Order reflects that this limitation was a compromise between the parties so as to get document production underway. Mad Catz retained its right to bring the instant motion to include Mr. Peterson as "designed counsel" without qualification. (ECF No. 28 n.1.)

Plaintiff filed the instant motion seeking to amend the protective order to remove the limitations placed on Mr. Peterson as designated counsel, thereby providing him with authorized access to all documents and information produced in this case. Defendant opposes the amendment sought by Plaintiff, arguing Mr. Peterson is a competitive decision maker for Mad Catz and any inadvertent disclosures of sensitive information could both irreparably harm Razer and provide Mad Catz with an unfair competitive advantage.

## II. Legal Standard

Parties seeking discovery are generally entitled to all information "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). "On the other hand, responding parties are entitled to protection from undue burden in discovery, including protection from misuse of trade secrets by competitors." *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992); Fed. R. Civ. P. 26(c)(1)(G). A court reviewing a protective order dispute must balance these interests.

In this case, these interests must be balanced to determine whether Defendant Razer is entitled to the continued protection provided by the operative protective order insofar as it restricts attorney Peterson's access to highly confidential information produced in this litigation. Here, because the parties stipulated to the protective order, it was entered by the Court without a finding of good cause. (ECF Nos. 33, 34.) As such, Defendant bears the burden of showing good cause exists for the continued protection it seeks. *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011) ("When the protective order 'was a stipulated order and no party ha[s] made a 'good cause' showing,' then 'the burden of proof . . . remain[s] with the party seeking protection.'"); *Phillips v. Gen. Motors Corp.,* 307 F.3d 1206, 1210-11, n.1 (9th Cir. 2002) ("the burden of proof will remain with the party seeking protection when the protective order was a stipulated order and no party had made a 'good cause' showing.").

Further, the Ninth Circuit has developed a balancing test to determine when a protective order restricting an attorney's access to highly confidential information may be appropriate. *See Brown Bag*, 960 F.2d at 1470. A court must weigh the prejudice to the party whose attorney is being denied access to protected documents against the risk of inadvertent disclosure of highly confidential information and the potential harm of inadvertent disclosure to the party wishing to maintain the protective order. *Id*. In doing so, the Court is to "examine factually all the risks and safeguards surrounding inadvertent disclosure" and factor in "the nature of the claims and of a party's opportunity to develop its case through alternative discovery procedures." *Id*. This analysis "must be determined . . . by the facts on a counsel-by-counsel basis." *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984).

**III.   Analysis**

    **A.   Harm to Razer from Modifying Protective Order**

        **1.   Risk of Inadvertent Disclosure**

Defendant Razer argues that "[a]s a competitor of Razer in the field of computer gaming peripherals, Mad Catz threatens unfair competitive harm to Razer by demanding its business insider and fiduciary, Mr. Peterson, have unfettered access to Razer's competitive information." (ECF No. 36 at 5.) In contrast, Plaintiff Mad Catz argues that there is no risk of harm through inadvertent disclosure because Mr. Peterson does not engage in competitive decision making on behalf of Mad Catz.[2] The Court is persuaded that the record before the Court shows Mr. Peterson is not significantly involved in Mad Catz's competitive decision making as it concerns Razer's business; that there are safeguards in place at Mad Catz to prevent the inadvertent disclosure of Razer's highly confidential

---

[2]  The parties agree that the Court's analysis of risk should focus on inadvertent disclosure, as Razer does not argue Mr. Peterson would intentionally disclose Razer's highly confidential information.

information to others; that there is little to no risk of inadvertent disclosure; and that Razer has not shown significant harm would likely result from an inadvertent disclosure. Therefore, Defendant fails to meet its burden of showing good cause exists for the continued protection it seeks.

Whether there is an acceptable risk of inadvertent disclosure turns on the extent to which Mr. Peterson is involved in competitive decision making as it concerns Razer's business. *See Brown Bag*, 960 F.2d at 1470. The phrase "competitive decision making" is "shorthand for a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel Corp.*, 730 F.2d at 1468 n.3. "[T]he standard is not 'regular contact' with other corporate officials who make 'policy,' or even competitive decisions, but 'advice and participation' in 'competitive decisionmaking.'" *Matsushita Elec. Indus. Co., Ltd. v. United States*, 929 F.2d 1577, 1580 (Fed. Cir. 1991).

In examining whether an attorney's role at a company creates an unacceptable risk of disclosure to a competitor company, courts analyze whether providing an attorney with access to highly confidential information would place that attorney "in the 'untenable position' of having to refuse his employer legal advice on . . . competitive [] decisions lest he improperly or indirectly reveal" another company's highly confidential information. *Brown Bag*, 960 F.2d at 1471. Although a finding that counsel is a competitive decision maker is a critical factor, it is not dispositive. *See ST Sales Tech Holdings, LLC v. Daimler Chrysler Co.*, No. 07cv346, 2008 WL 5634214, at *3 (E.D. Tex. Mar. 14, 2008); *see also Fairchild Semiconductor Corp. v. Third Dimension Semiconductor, Inc.*, No. 08cv158, 2009 WL 1210638, at *9 (D. Me. Apr. 30, 2009).

Defendant Razer argues that Mr. Peterson is a competitive decision maker for its competitor, Mad Catz. In support, Razer cites Mad Catz's "Investor Relations"

page which states Mr. Peterson is responsible for all corporate opportunities at Mad Catz and has negotiated numerous license and other agreements within the video game industry." (ECF No. 36-1 at 3.) Razer also states that Mr. Peterson is the second-largest shareholder listed on Mad Catz's "Investor Relations-Ownership Summary webpage. (*Id.* at 4.) Razer also provides an article by the *San Diego Source, The Daily Transcript* which states "Mr. Peterson works closely with the CEO and CFO to provide advice and counsel on a host of business issues." (*Id.*) The Court finds this evidence unpersuasive.

Mr. Peterson has three different roles at Mad Catz: (1) General Counsel; (2) Corporate Secretary; and (3) Vice President of Business Affairs. First, he serves as the General Counsel. As General Counsel, Mr. Peterson's duties are to:

> (a) advise management and the Board of Directors on the best methods and manner to minimize legal risks to Mad Catz; (b) manage Mad Catz's intellectual property portfolio and to advise as to the legality of intellectual property issues; (c) conduct and lead all litigation matters in state and federal courts; (d) review contracts and advise as to their enforcement and/or modification; (e) draft contracts using already-negotiated contract terms supplied by Mad Catz managerial and sales staff; (f) prepare documents and correspondence on employment matters; (f) [*sic*] review insurance policies and file claims with insurance companies; and (g) ensure Mad Catz's compliance with all applicable laws and regulations.

(ECF No. 35-2 ¶15.)

At oral argument, Mr. Peterson represented that, in his role as General Counsel, Mr. Peterson focuses on litigation and overarching corporate legal matters, such as advising on SEC compliance matters and creating legal safeguards for fraud prevention. Mr. Peterson regularly interacts with Plaintiff Mad Catz's Chief Executive Officer and Chief Financial Officer, but not with respect to competitive decision making. Mr. Peterson does not regularly interact with Plaintiff's Chief Operating Officer, Vice President of Sales or the Vice President of Marketing. With respect to Mr. Peterson's involvement in licensing, Mr. Peterson maintains that he does not set the business terms of the deals but rather focuses on the legal matters only.

Defendant Razer is particularly concerned that Mr. Peterson's role in the negotiation of licensing agreements makes him a competitive decision maker for Mad Catz. According to Razer, Mr. Peterson's involvement in licensing negotiations creates an unacceptable risk that Razer's highly confidential information may be disclosed. Specifically, Razer points to Mr. Peterson's involvement in securing a license from Humanscale regarding the '370 Patent as evidence that he is a competitive decision maker who should be denied access to Razer's highly confidential information.

The Court is not persuaded that the evidence of Mr. Peterson's involvement in licensing agreement negotiations is sufficient to show Mr. Peterson engages in competitive decision making regarding keyboard and mouse products or technology. Mr. Peterson does not negotiate the terms of the licensing agreements but rather takes the terms from the sales and management teams from Mad Catz and "fit[s] them into the context of a legal agreement." (*See* ECF No. 35-2 ¶17.) In addressing the Humanscale licensing deal, Mr. Peterson addressed the unique facts underlying that deal (which arose out of litigation) and represented that after the management team and sales people came up with the terms for the licensing agreement with Humanscale, he "parroted" the terms to Humanscale to close the deal. The Court finds Mr. Peterson's representations regarding his role in licensing negotiations to be credible and concludes that Mr. Peterson's involvement in Mad Catz's licensing agreements does not constitute competitive decision making that would create an unacceptable risk of disclosure to Razer.

Second, in his role as Corporate Secretary, Mr. Peterson's duties are limited to keeping minutes for the Board of Directors meetings and calling out agenda items. (*See* ECF No. 35 ¶16.) Mr. Peterson represents that he acts as a "mute stenographer" in his role as Corporate Secretary and has never been asked for input regarding business matters.

Third, in his role as Vice President of Business Affairs, Mr. Peterson supervises and manages Saitek brand products for Mad Catz which are Mad Catz's flight simulator related products. (ECF No. 35 ¶17.) He is also in charge of overseeing corporate opportunities for Mad Catz including mergers, acquisitions and strategic partnerships. (*Id.*) Mr. Peterson papers the deals after the business people at Mad Catz decide on which corporate opportunities to pursue.

In his role as Vice President, it appears Mr. Peterson does make competitive decisions for Mad Catz's flight simulation business. However, Razer has not established that Mr. Peterson's responsibilities with respect to the flight simulation business create an unacceptable risk to Razer from the disclosure of sensitive information regarding Razer's mouse and keyboard business. Razer and Mad Catz are not competitors with respect to the flight simulation business. Razer has not established that Mr. Peterson's participation in making competitive decisions on one line of products increases the risk that confidential information regarding another line of products will be inadvertently disclosed. Thus, Mr. Peterson's involvement in Mad Catz's flight simulation business does not constitute competitive decision making that would create an unacceptable risk of disclosure to Razer.

Regardless of which of the three roles he is serving in at Mad Catz, Mr. Peterson represents that his office at Mad Catz is private and secure. (ECF No. 35-2 at 7 n.2.) His office is kept locked at all times when not occupied. Mr. Peterson maintains his confidential legal files in his secure office or on restricted (to in-house counsel only) computer drives at all times. (*Id.*) Accordingly, there are safeguards in place to ensure highly confidential information is not accessed by other Mad Catz employees.

Having reviewed and analyzed the record and arguments of counsel, the Court is not persuaded that Mr. Peterson's roles at Mad Catz give rise to an unacceptable risk of disclosure such that he should be denied access to Razer's highly confidential information.

## 2. Potential Harm from Inadvertent Disclosure to Defendant

Defendant Razer argues that a disclosure of its highly confidential information would give Mad Catz an unfair competitive advantage.  Razer depicts its highly confidential documents as containing information about its:

> research, design, development, configuration, function, assembly, testing, manufacture, components, operation, marketing, business and strategic plans, third-party agreements, sale, and/or revenues for Razer's Ouroboros mouse (the Razer product Mad Catz alleges infringes the '370 patent) and/or Lycosa keyboard (which Razer alleges practices some of the claims of the '063 patent).

(ECF No. 35 at 8.)  Counsel for Razer argues that Razer would be especially harmed by disclosure of its pricing and revenue information.

 Although the modification of the protective order sought by Mad Catz would provide Mr. Peterson access to this sensitive information, Defendant Razer has not persuasively explained how inadvertent disclosure would likely harm Razer.  As an initial matter, Razer no longer makes the keyboard that utilizes the '063 Patent.  Further, while the financial documents at issue concern Razer's gaming mice and keyboards, Mr. Peterson does not interact with any personnel from Sales or Marketing regarding competitive keyboard or mouse issues, nor does he interact with the COO (who would be the individual in charge of managing Mad Catz's engineers and design plans for keyboards and mice).  Mr. Peterson is not involved in Mad Catz's competitive decision making as it concerns competition with Razer's business.

The Court concludes that Razer fails to meet its burden to show that specific prejudice or harm will result if the protective order is modified to allow Mr. Peterson access to the highly confidential documents produced in this case.  Specifically, the Court is not persuaded on the current record that the potential harm to Razer would be irreparable or result in a significant competitive advantage to Mad Catz.

/ / /

### B. Harm to Plaintiff from Leaving Protective Order Unmodified

In contrast, the Court concludes that Plaintiff Mad Catz will continue to suffer actual prejudice until its lead trial counsel, Mr. Peterson, is provided access to the highly confidential information produced in this litigation.

Under *Brown Bag*, the risk of disclosure of confidential information to competitors must be weighed against the risk of actual prejudice – that protection of this information will impair the prosecution or defense of the parties' claims. *Brown Bag*, 960 F.2d at 1470. A showing that the protective order increases the difficulty of managing litigation, without more, does not constitute actual prejudice. *Intel Corp. v. VIA Technologies, Inc.*, 198 F.R.D. 525, 529 (N.D. Cal. 2000). However, a party can show actual prejudice where "the present litigation is extremely complex and at an advanced stage" so that relying on newly retained counsel "would create an extreme and unnecessary hardship." *U.S. Steel Corp.*, 730 F.2d at 1468; *see also CytoSport, Inc. v. Vital Pharm., Inc.*, No. 08cv2632, 2010 WL 1904840 at *2 (E.D. Cal. May 10, 2010) ("Courts have found actual prejudice where a party has shown that the use of in-house counsel was necessary due to the specialized expertise of the counsel, required in order to maintain a company's financial stability or essential to its prosecution or defense of an action due to outside counsel's incompetency or lack of sufficient time to present the client's best case."). Further, financial hardship is a factor when evaluating the balancing test, but it is not dispositive. *RPA Int'l Pty Ltd. v. Compact Int'l, Inc.,* No. 06cv1147, 2007 WL 4105725 at *3 (S.D. Cal. Nov. 16, 2007).

Razer argues that Mad Catz will not suffer actual prejudice under the current protective order because this is a "straightforward patent case" in which the relevant documents on the issues Razer deems to be central to the litigation are available to Mr. Peterson. (ECF No. 36 at 10.) Mad Catz disagrees. Mad Catz argues that this

is a complex and fact intensive patent case in which the critical documents are not publicly available.[3]

In support, Mad Catz argues that its defense against Razer's counterclaims center around the conception and the reduction to practice of Razer's '063 Patent.[4] Indeed, Mad Catz alleges as an affirmative defense that the '063 Patent is invalid for "failure to comply with 35 U.S.C. § 102 as being anticipated by one or more prior art references and/or because the alleged invention was known or used by others or patented or described in a printed publication before the invention thereof by the applicant for patent." (ECF No. 21 at 7.) To prevail on this defense, Mad Catz seeks to prove it "introduced its accused keyboard to the world months before Razer filed its patent application and that Mad Catz conceived of its accused keyboard before Razer even came into existence." (ECF No. 40 at 12.) The Court is persuaded that this is a complex and fact intensive patent case that may hinge on Mad Catz's evaluation of Razer's highly confidential information.

Razer also argues that Mad Catz will not suffer actual prejudice under the current protective order because Mr. Marshall, the other in-house litigation counsel for Mad Catz, can adequately litigate the portions of the case the require access to highly confidential information. Razer provides examples of Mr. Marshall's competence in taking an important deposition and signing every pleading and discovery paper for this case. Mad Catz argues that actual prejudice exists because the current protective order effectively disqualifies Mr. Peterson as Mad Catz's lead trial attorney, leaving Mad Catz with only one, less experienced, litigator to analyze, prepare, and present this complex patent case for trial or settlement.

---

[3] According to Mad Catz, Razer marked approximately 84% of its documents as "highly confidential" in this litigation. (ECF No. 40 at 11.)

[4] Conception is the "formation, in the mind of the inventor, of a definite and permanent idea of a complete and operative invention." *Solvay S.A. v. Honeywell Int'l Inc.*, 742 F.3d 998, 1000 (Fed. Cir. 2014). Reduction to practice is when the inventor has constructed an embodiment of the invention and the inventor has determined that the invention works for its intended purpose. *See Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998).

The Court is persuaded that the current protective order effectively disqualifies Mad Catz's lead trial attorney, and under the facts of this case, impairs Mad Catz's prosecution if its claims and its defense against Razer's claims. Here, in contrast with the cases cited by Razer, there is no evidence in the record that Mad Catz has outside litigation counsel who is already familiar with its patents and technology.[5] Instead, the record shows that Mad Catz maintains a two-person in-house patent litigation team only. This team is maintained, in part, to keep legal costs down. (ECF No. 35-1 at 14.) This team is comprised of Mr. Peterson and Mr. Marshall only.

Further, Mad Catz selected Mr. Peterson to serve as its lead trial counsel for all its litigation matters. (ECF No. 35-2 ¶15.) Mr. Peterson has twenty-four years of substantial experience litigating cases, including trying five cases to verdict. (ECF No. 40 at 8.) Mr. Peterson is assisted by Mr. Marshall, who is the only other in-house litigator for Mad Catz who assists with patent litigation matters. The record does not reflect that Mr. Marshall has comparable experience as a trial attorney.

Razer cites *Carpenter Technology Corp. v. ARMCO, Inc.*, 132 F.R.D. 24 (E.D. Pa. 1990), for example, in support of its argument that Mr. Marshall, who already has access to the protected documents, will provide adequate representation for Mad Catz. In *Carpenter*, the Court denied the corporation's Director of Law (functionally the general counsel for the corporation) access to documents while granting access to a senior staff attorney who was also in-house counsel for the corporation. However, the Court found the staff attorney to be sufficient because

---

[5] For example, in *Brown Bag,* at the time of the motion to amend the protective order, Plaintiff Brown Bag Software did not have outside counsel. However, the Court noted that Plaintiff Brown Bag previously had outside counsel and that "Brown Bag's former outside counsel had already had over six months in which to study the trade secrets. Brown Bag knew of the court-ordered deadline for summary judgment motions, and had ample time to develop any admissible evidence it could from the trade secrets divulged to it." *Brown Bag*, 960 F.2d at 1471.

Plaintiff also retained outside counsel. *Id.* at 28. In contrast here, Mad Catz does not have, nor is it planning on retaining, outside counsel.

Unlike the senior staff attorney that oversaw outside counsel's work in the *Carpenter* litigation, Mr. Marshall would be actively handling all aspects of this complex litigation, often without meaningful assistance on critical matters. For example, Mr. Marshall would be precluded from seeking strategic advice or motion drafting assistance from Mr. Peterson regarding Mad Catz's conception and reduction to practice arguments. Mr. Marshall also likely would have to attend every deposition to account for the possibility that under the current protective order Mr. Peterson may be required to excuse himself from portions of the depositions that concern information contained in protected documents. Depriving Mr. Peterson full access to the documents in this case substantially impairs every aspect of Mad Catz's presentation of its case, including settlement.

The record shows that Mr. Peterson has superior expertise in the field of patent litigation and that Mad Catz heavily relies on Mr. Peterson in any litigation and in settlement decisions. Razer has marked 84% of its documents as "highly confidential," including documents containing critical information on the conception and reduction to practice of the keyboard technology at issue and financial documents on Razer's accused infringing product. In light of Mr. Peterson's important role in this litigation and the Court's conclusion above that there is little to no risk of inadvertent disclosure or irreparable harm to Razer, the Court concludes that limiting Mr. Peterson's access to highly confidential documents creates an undue and unnecessary burden for Mad Catz in this case. Plaintiff Mad Catz will continue to suffer actual prejudice until its lead trial counsel, Mr. Peterson, is provided full access to the highly confidential information produced in this litigation. Thus, having carefully considered and balanced the parties' interests, Defendant Razer has not shown good cause exists to restrict Mr.

Peterson's access to highly confidential information produced for purposes of this litigation.

### III. Conclusion

For the foregoing reasons, the Court hereby **GRANTS** Plaintiff's Motion to Modify the Protective Order (ECF No. 35). The parties shall submit a joint motion with a proposed amended protective order on or before **August 29, 2014**. Further, Whitney E. Peterson shall enter his appearance for this case with the CM/ECF system as soon as practicable.

DATED: August 19, 2014

JILL L. BURKHARDT
United States Magistrate Judge