1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| MAD CATZ INTERACTIVE, INC., an Ontario corporation,, | CASE NO. 3:13-cv-2371-GPC-JLB |
| Plaintiff/Counterclaim Defendant, v. | **ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NOS. 6,157,370; 8,605,063** |
| RAZER USA, LTD, a Delaware corporation,, | |
| Defendant/Counterclaim Plaintiff. | |

11
12
13
14
15
16

## I. INTRODUCTION

17

On October 3, 2013, Plaintiff Mad Catz Interactive, Inc. ("Mad Catz") filed a

18

complaint alleging infringement of U.S. Patent No. 6,157,370 (the "'370 Patent") by

19

Razer, USA, LTD ("Razer"). (ECF No. 1.) Mad Catz alleges that, among others,

20

Razer's "Ouroboros" mouse infringes the '370 Patent. (*Id.* ¶ 14.) On January 10, 2014,

21

Razer filed a counterclaim alleging infringement of U.S. Patent No. 8,605,063 (the

22

"'063 Patent") by Mad Catz. (ECF No. 15.) Razer alleges that Mad Catz's

23

"C.Y.B.O.R.G. V.7" keyboard infringes the '063 Patent. (*Id.* ¶ 27.)

24

## II. LEGAL STANDARD

25

Claim construction is a matter of law to be determined by the court. *Markman*

26

*v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd* 517

27

U.S. 370 (1996). Claims are to be construed in a manner that "stays true to the claim

28

language and most naturally aligns with the patent's description of the invention.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc).

To construe disputed terms, the Court first looks to the claims themselves. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). Generally, claim language is given its "ordinary and customary meaning," defined as "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13. In cases where the "ordinary and customary meaning" is clear, claim construction involves "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.[1]

In cases where a term's meaning would not be apparent to a person of ordinary skill in the art at the time of the invention, the Court looks to other sources to construe the term. *Id.* When looking at sources other than claim language, the Court considers the context in which the term appears *Id.* at 1313. The specification is also "'always highly relevant'" and "'[u]sually [] dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Where the inventor gives a term a special meaning, "the inventor's lexicography governs." *Id.* at 1316. Where the inventor specifically disclaims a certain scope in the specification, that disclaimer is similarly dispositive. *Id.*

The Court may also look to the patent's prosecution history, when it is admitted into evidence, which includes the complete record of proceedings before the USPTO, as well as cited prior art references. *Id.* at 1317. Finally, the Court may consider extrinsic evidence such as "expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980 (internal citations omitted). However, extrinsic

[1] Razer argues that the Court "must provide a construction" and that adopting the "plain and ordinary meaning" "would be no construction at all." (ECF No. 47, at 9–10.) Razer's argument misses the mark. The Court may construe disputed terms according to their plain and ordinary meaning, *see, e.g., Apple, Inc. v. Samsung Electronics Co., Ltd.*, No. 11-cv-1846-LHK, 2012 WL 1123752 (N.D. Cal. Apr. 4, 2012), so long as "disputes concerning the scope of the patent claims are fully resolved." *Every Penny Counts, Inc. v. Am. Ex. Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009).

evidence is "less significant than the intrinsic record" and "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1317–18 (internal quotation marks and citation omitted).

### III. Discussion

**A. '370 Patent**

The '370 patent, entitled "Ergonomic Mouse Extension," discloses a "computer pointing device." '370 Patent Abstract. The computer pointing device includes "a conventional computer mouse" and "an ergonomic extension." *Id.* The application for the '370 Patent was filed on December 11, 1996, and the patent was issued on December 5, 2000. It is a continuation-in-part of a prior application, which dates back to January 3, 1996.[2] The parties dispute six terms in the '370 patent.

**1. "a computer mouse"**

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "a cursor control device consisting of a hand-graspable body containing a motion-sensing component such that movement of the device across a surface affects the position of a cursor on a visual display." |

The term "a computer mouse" appears in Claims 1 and 2 of the '370 Patent. Razer contends that the limitations it urges are intrinsic to a computer mouse and thus must be included within the construction. Mad Catz responds that "[n]o construction is necessary or even appropriate." (ECF No. 46, at 8.) Though Mad Catz is correct that

---

[2] For the '370 Patent, Razer's expert defines a person of ordinary skill in the art as someone with "a bachelor's degree in cognitive science, ergonomics, industrial design, computer user interface design or an equivalent degree, and at least 2 years of demonstrated real-world experience in the field of computer user interface design, computer ergonomics and/or industrial design" or with "expertise in and appreciation of human factors in computing systems as well as sufficient knowledge of hardware and software technology to be able to specify and/or direct engineer(s) in the building of systems to human-computer interaction specifications." (ECF No. 47-9, at 7.) Mad Catz does not offer a definition of a person of ordinary skill in the art. The Court finds that Razer's definition is reasonable and therefore adopts Razer's definition of a person of ordinary skill in the art.

"not all terms require construction," (*id.*), the Court must resolve disputes between the parties. *Every Penny Counts*, 563 F.3d at 1383. Because of Mad Catz's view, they appear to dispute only Razer's inclusion of the term "consisting" and "body." (ECF No. 46, at 8–9; ECF No. 50, at 3–4.)

### a. Claim Language

The claims themselves do not define the term "a computer mouse." Thus the Court turns to the specification.

### b. Specification

The specification states that present invention includes a "conventional computer mouse" and notes that "'point and click' operation has become widespread." '370 Patent, 1:19, 2:14. The specification also recites that the invention includes "an ergonomic extension adapted to support a human palm," which supports Mad Catz's contention that the computer mouse need not be hand-graspable. *Id.* at 2:14–15. The specification further recites that a mouse "is moved on a flat surface to effect corresponding movement of an icon on a computer screen." *Id.* at 1:24–26.

### c. Extrinsic Evidence

Razer's expert, Eric Gould Bear, opines that "'computer mouse' was used according to its plain and ordinary meaning at that time," but it would have had "a particular meaning to persons of ordinary skill in the art as evidenced by technical dictionary definitions and prior patents available at the time of the invention." (ECF No. 46-1, Ex. C, at 26.) Razer further points to THE IEEE STANDARD DICTIONARY OF ELECTRICAL AND ELECTRONICS TERMS, (6th Ed. 1996), which defines a mouse as a "cursor control device, used as a locator, consisting of a hand-held control box within some sort of motion-sensing component such that the position or movement of the mouse on a surface controls the position of a cursor on a display" and U.S. Patent No. 5,414,445 which recites that moving a computer input device "move[s] a cursor on a computer screen." (ECF No. 46-1, Ex. C, at 26.)

Mad Catz responds that Razer's construction is too limited because it excludes

traditional computer mouse components as well as the slot and extension arm referenced in Claim 1. (ECF No. 50, at 3–4.) The Court agrees with Mad Catz that Razer's use of "consisting of" is unwarranted. "Consisting of" is a closed transition phrase that excludes any element not specified in the list. *AFG Inds., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1245 (Fed. Cir. 2001). Because, as Mad Catz points out, computer mice can include things such as scroll wheels, buttons, keys, and other parts, as well as a slot or extension arm, the open transition phrase "comprising" is more appropriate. *See id.*

With regards to the "body" limitation urged by Razer, the Court finds no support for that limitation. The term "mouse body" appears only in alternative embodiments of the invention and the IEEE definition does not use the term "body." However, the Court does find support in both the IEEE definition and U.S. Patent No. 5,414,445 for the other limitations urged by Razer. The specification states that computer mice "effect movement of an icon on a computer screen," supporting Razer's "cursor control device" and "position or movement of the mouse on a surface controls the position of a cursor on a display" language. U.S. Patent No. 5,414,445 references that computer mice are "grasp[ed]," which supports Razer's "hand graspable" language as the IEEE's definition using "hand-held" is not necessarily supported since computer mice are moved by a hand and not necessarily "held" by a hand. Mad Catz does not appear to dispute that these are supported limitations as Mad Catz takes primary issue with Razer's use of "body" and "consisting of."

Accordingly, the Court construes "a computer mouse" to mean "a hand-graspable cursor control device comprising a motion-sensing component such that the position or movement of the mouse on a surface controls the position of a cursor on a display."

/ /

/ /

/ /

**2. "an extension arm fixed to the computer mouse and extending outwardly therefrom"**

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "an extension arm fixedly attached to the rear of the body of the computer mouse and extending outwardly therefrom" |

The term "an extension arm fixed to the computer mouse and extending outwardly therefrom" appears in Claim 1 of the '370 patent. Razer contends that the dispute between the parties is whether the "extension arm" is a part of the "computer mouse." (ECF No. 47, at 10.)

### a. Claim Language/Specification

As an initial matter, the claim language indicates that the "the ergonomic extension," which includes the "extension arm," is separate from the "computer mouse" as both of those objects are listed as separate elements comprising the "computer pointing device" in Claim 1. '370 Patent, 6:18–45. The claim language stating that the "extension arm" is "fixed to the computer mouse and extend[s] outwardly therefrom" further indicates that the "computer mouse" does not itself include the "extension arm." *Id.* at 6:33.

The claim language itself contains no reference to the way nor the position from which the extension must be attached to the mouse. Nor does the language Razer adds to its proposed construction appear in the claim language. However, the claim language in Claim 1 does state that the ergonomic extension is "adapted to support a human palm." The background to the invention states that the "ergonomic wrist rest"is "length-adjustable so as to enable the wrist rest to provide an ergonomic benefit to users with different size hands." *Id.* at 1:13–15. The specification further recites that "the computer mouse has a rear portion and an upper surface" and that the "ergonomic extension includes a cavity therebeneath adapted for insertion of at least part of the rear portion of the mouse." *Id.* at 2:35–38.

Mad Catz argues that "nothing in the claims or specification supports Razer's position that the extension arm must be fixed or even fixedly attached to the rear of the body of the computer mouse." (ECF No. 46, at 10.) Razer draws the term "fixedly attached" from specification language used to describe an alternative embodiment of the invention. *See* '370 Patent, 4:36. However, neither Razer nor its expert explains what difference, if any, exists between the terms "fixed" and "fixedly attached."

### b. Extrinsic Evidence

Razer's expert opines that a person of ordinary skill in the art would find that, in light of the specification, "the extension arm is fixedly attached to the rear of the body of the computer mouse." (ECF No. 47-9 ¶ 35.) Razer's expert arrives at this conclusion because "the patent describes two ways in which the extension arm is attached to the mouse" and "Claim 1 refers only to the way in which the extension arm is fixed to the body of the mouse." (*Id.* ¶ 34.)

In light of the specification and claim language's indication that the ergonomic extension supports the palm and/or wrist, and that the buttons on the computer mouse are positioned at the front, the Court does find that a person of ordinary skill in the art would limit the term language to mean that the extension arm is fixed to the rear of the computer mouse. While the Court agrees with Razer's expert that Claim 1 refers to a device where the extension arm is "fixed" to the computer mouse, there is no support in the claim language or specification for the limitation that it must be fixed to the computer mouse's "body." Additionally, the term "fixedly attached" is used only in a single alternative embodiment of the invention and thus is not an appropriate limitation for this claim language. Accordingly, the Court does not find that a person of ordinary skill in the art would limit the term "fixed" to "fixedly attached" or to require being fixed to the "body of the computer mouse." However, because the ergonomic extension is designed to support either a palm or wrist or both, there is support for the limitation that the ergonomic extension must be attached to the rear of the mouse since the mouse itself would generally be operated by a user's fingers which are in front of a user's

1    palm and wrist.

2        Accordingly, the Court construes the term "an extension arm fixed to the

3    computer mouse and extending outwardly therefrom" to mean "an extension arm fixed

4    to the **rear of** computer mouse and extending outwardly therefrom." Thus, the Court

5    **does not limit** the term to mean that the extension arm must be fixedly attached to the

6    body of the computer mouse.

7        **3. "an extension arm extending between the computer mouse and the**

8        **ergonomic extension"**

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning. | "either: (1) one end of the extension arm is fixedly attached to the rear of the body of the computer mouse, or extends into the rear of the body of the computer mouse, and the other end of the extension arm extends into the slot in the ergonomic extension and is releaseably locked therein; or (2) one end of the extension arm is fixedly attached to the ergonomic extension and the other end of the extension arm extends into the slot in the rear of the body of the computer mouse and is releaseably locked therein" |

18       The term "an extension arm extending between the computer mouse and the

19   ergonomic extension" appears in Claim 2 of the '370 patent. This language from Claim

20   2 is quite similar to the above language from Claim 1 except that the extension arm

21   "extend[s] between" the computer mouse and ergonomic extension rather than being

22   "fixed to" and "extending" from the computer mouse. Razer argues that the parties'

23   dispute over this language "is the same as their dispute over the similar phrase from

24   claim 1." (ECF No. 47, at 11.)

25                    **a. Claim Language/Specification**

26       As an initial matter, the claim language indicates that the "the ergonomic

27   extension," which includes the "extension arm," is separate from the "computer mouse"

28   as both of those objects are listed as separate elements comprising the "computer

pointing device" in Claim 2. '370 Patent, 6:47–7:7. The claim language stating that the "extension arm" "extend[s] between the computer mouse and ergonomic extension" further indicates that the "computer mouse" does not itself include the "extension arm." *Id.*

The claim language contains no reference to the way nor the position from which the extension must be attached to the mouse. The claim language in Claim 2 does reference a slot, noting that there is "a slot in the computer mouse or the ergonomic extension adapted to receive the extension arm for slidable movement therein." *Id.* The claim language also recites that the ergonomic extension is "adapted to support a human palm." *Id.*

The specification states that the invention contains an "ergonomic wrist rest" that is "length-adjustable so as to enable the wrist rest to provide an ergonomic benefit to users with different size hands." *Id.* at 1:13–15. The specification further recites that "the computer mouse has a rear portion and an upper surface" and that the "ergonomic extension includes a cavity therebeneath adapted for insertion of at least part of the rear portion of the mouse." *Id.* at 2:35–38.

**b. Extrinsic Evidence**

Razer's expert opines that a person of ordinary skill in the art would construe the term in favor of Razer's proposed construction because the claim language read in connection with the specification "would have communicated . . . more about how the extension arm interacts with the mouse and the ergonomic extension, which is not captured in the words of the claim by themselves." (ECF No. 47-9 ¶ 37.) Razer's main contention is that "extending between" means that the "extension arm" is either "fixedly attached" to the computer mouse or "fixedly attached" to the ergonomic extension and that the other end of the "extension arm" therefore "extends into a slot" on either the computer mouse or ergonomic extension that it is not attached to.

As discussed above, the Court does find that the "rear of the computer mouse" limitation urged by Razer is appropriate in light of the specification and claim

language's indication that the ergonomic extension supports the palm and/or wrist, and that the buttons on the computer mouse are positioned at the front. However, nothing in the claim language, specification, or extrinsic evidence cited by Razer supports the contention that the extension arm in Claim 2 must be fixed to either the computer mouse or the ergonomic extension. While the claim language indicates that one of these must have a slot "to receive the extension arm," the claim language's use of the term "comprises" is open-ended, indicating that it is at least possible for both to have a slot. *See CIAS, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1359–60 (Fed. Cir. 2007). Thus a person of ordinary skill in the art would not limit the extension arm to be "fixedly attached" to either the computer mouse or the ergonomic extension because the claim language and specification do not indicate exactly how the extension arm is to be attached to the end that does not have the requisite slot.

The other limitations urged by Razer regarding one end extending into a slot and the extension arm being "releasably locked" are already included within the rest of the claim language where it states that the invention contains: (1) "a slot in the computer mouse or the ergonomic extension adapted to receive the extension arm for slidable movement therein"; and (2) a "locking means for releasably locking the extension arm at any of a plurality of positions in the slot." '370 Patent, 6: 33–39. This claim language makes these additional limitations improper because they would render the other language in the claim redundant. *See Becton, Dickinson and Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) (collecting cases where claim constructions that would render claim language superfluous were rejected).

Accordingly, the Court construes the term "an extension arm extending between the computer mouse and the ergonomic extension" to mean "an extension arm extending between **the rear of** the computer mouse and the ergonomic extension." Thus, the Court **does not include** any other limitations urged by Razer.

/ /

**4. "releasably locking the extension arm in any of a plurality of positions in the slot"**

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | "frictionally engaging the extension arm in the slot, such that movement of the ergonomic extension relative to the extension arm is only possible when a sufficient amount of force is applied along the axis of the extension arm to bring the protuberance out of frictional engagement with one of the notches." |

The term "releasably locking the extension arm in any of a plurality of positions in the slot" appears in Claims 1 and 2 of the '370 patent.

### a. Claim Language/Specification

Claims 1 and 2 do not address whether friction is a required limitation. The specification does note that, in the alternative embodiment in Figure 5, "a sufficient amount of force is applied to bring the protuberance out of engagement with the notch." '370 Patent, 4:47–50.

### b. Extrinsic Evidence

Razer's expert opines that specification's statement that "a sufficient amount of force is applied to bring the protuberance out of engagement with the notch" provides support for Razer's construction. (ECF No. 47-9 ¶ 55.) Razer's expert further opines that a person of ordinary skill in the art would have understood the alternative embodiment in Figure 9 to "provide the only enablement of human interaction for the embodiments of Claims 1 and 2." (*Id.* ¶ 56.) Finally, Razer's expert opines that the specification's statement that the "protuberance is preferably biased" meant that this "bias":

> enables the protuberance, in a relaxed position, to frictionally engage with a notch on the extension arm to retain the ergonomic extension in a locked position relative to the mouse, and that when desired to adjust the position of the ergonomic extension relative to the mouse, force would need be applied along the axis of the extension arm to both the ergonomic extension and the mouse sufficient to overcome the resiliency of the protuberance so as to bring the protuberance out of frictional engagement

with the notch and to enable movement of the ergonomic extension relative to the mouse.

(*Id.* ¶ 51.)

Mad Catz responds that Razer "conflates clear language addressing the need for a locking means with what Razer believes is the only locking means possible." (ECF No. 46, at 12.) Mad Catz argues that "claims 1 and 2 disclose at least two separate means to adjust the computer mouse relative to the ergonomic extension." (ECF No. 46, at 13.)

The Court agrees with Mad Catz. The limitations urged by Razer come from one alternative embodiment and the Federal Circuit has "repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323. While the specification makes clear that friction is one method by which the "releasable lock[]" can function, it is not the only method. There exist other forces, such as magnetism, that could be used to create a "releasably locking extension arm."

Accordingly, the Court construes the term "releasably locking the extension arm in any of a plurality of positions in the slot" to have its plain and ordinary meaning. Thus the Court **does not limit** the term to mean that there must be frictional engagement or that a sufficient amount of force must be required to release the extension arm.

### 5. "protuberance adjacent to the slot"

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
|---|---|
| "Protuberance" and "adjacent to the slot" should be defined separately. | "material of the interior of the ergonomic extension that: (1) bulges beyond the surrounding surface of that portion of the ergonomic extension; (2) extends into the slot in the ergonomic extension; and (3) is shaped so to be able to frictionally engage with any of a plurality of the notches in the extension arm." |

The term "protuberance adjacent to the slot" appears in Claims 1 and 2 of the '370 Patent. The term "protuberance" also appears in Claims 1 and 2 of the '370 Patent.

Razer proposes that "protuberance adjacent to the slot" should be construed as a single phrase. Mad Catz argues that "protuberance" and "adjacent to the slot" should be defined separately.

### a. "protuberance"

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
|---|---|
| "anything, such as a knob, a pin, or a screw that protrudes." | Should be defined in conjunction with "adjacent to the slot." |

### b. "adjacent to the slot"

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
|---|---|
| Plain and ordinary meaning. | Should be defined in conjunction with "protuberance." |

### c. Claim Language/Specification

The claim language in Claims 1 and 2 states that the protuberance "engag[es] with any of the plurality of notches." '370 Patent, 6:42. The specification states that "[t]he guided movement is provided by a first guide slot on the ergonomic extension that engages with and is guided by a protuberance on the rearwardly extending lever." *Id.* at 2:56–58. The specification also includes several alternative embodiments that reference the protuberance, namely Figures 5, 5a, 8, and 9. In Figure 5a, the protuberance "extends into the slot" and " engages with one of the notches on extension arm 102 to lock extension 100a into a desired position." *Id.* at 4:41–43. Additionally in Figure 5a, "[t]he protuberance is preferably biased so as to engage with a notch aligned therewith to hold extension 100a in position." *Id.* at 4:44–46. Finally in Figure 5a, "[w]hen it is desired to vary the position of the mouse 100 relative to extension 100a, a sufficient amount of force is applied to bring the protuberance out of engagement with the notch." *Id.* at 4:46–49.

In Figure 9, "a protuberance 88 is provided that is sized and shaped to be inserted into and guided by slot 80, and may also serve as a stop to prevent movement of the ergonomic extension beyond a desired position." *Id.* at 5:53–57. Additionally in Figure

9, the protuberance is located "[t]oward the distal end of the lever 84." *Id.* at 5:53. Finally in Figure 9, "[w]hen it is desired to adjust the extension of the wrist support relative to the mouse body, force is applied to wrist support 50 and to mouse body 54 sufficient to overcome the resiliency of lever 54 so as to bring teeth 90 out of engagement with teeth 82 and to enable movement of the wrist support relative to the mouse body." *Id.* at 5:62–67.

### d. Extrinsic Evidence

First, Razer argues that Figures 8 and 9 of the '370 Patent support its construction because they "provide an unambiguous representation of the kind of structure meant by the term 'protuberance.'" (ECF No. 47, at 14.) Figure 9 of the '370 patent represents "protuberance 88" as a three dimensional rectangular object that sticks out and is "[t]oward the distal end of the lever 84." Razer's expert opines that a person of ordinary skill in the art "would recognize this illustrated ordinary 'protuberance 88' as bulging beyond the surrounding or adjacent surface, jutting out just enough 'to be inserted into and guided by slot 80.'" (ECF No. 47-9 ¶ 40.) Second, Razer argues that Figures 5 and 5a supports its construction that the "protuberance" "extends into the slot in the ergonomic extension." (ECF No. 47, at 13–14.) Razer's expert similarly opines that a person of ordinary skill in the art would understand the description to mean that the protuberance "extends into the slot in the ergonomic extension." (ECF No. 47-9 ¶ 44.) Third, Razer argues that the "description of the protuberance ['370 Patent, 4:39–42], in combination with the protuberance of Figures 8–9, would have taught that the protuberance must extend into the slot in order to engage with the notches on the extension arm in addition to being adjacent to the slot." (ECF No. 47, at 15; ECF No. 47-9 ¶ 41.)

Mad Catz responds that: (1) the intrinsic evidence does not limit the "protuberance to the interior of the ergonomic extension (palm rest)"; (2) "Claims 1 and 2 explicitly state that the protuberance is located either 'on the extension arm'. . . or 'adjacent the slot' on the ergonomic extension (palm rest) . . ."; (3) the claims do not

require that the protuberance "must extend into the slot in the ergonomic extension"; and (4) "there is nothing in the language of claims 1 and 2, or the written description," that "require[s] 'frictional engagement' with the notch." (ECF No. 46, at 15–16 (citations omitted).) Mad Catz supports its construction of "protuberance" by referencing the dictionary definitions cited by Razer—"'the quality of being protuberant,' to 'jut out,' a 'protuberant part of thing,' and a 'projection'"—and the words of the '370 patent's co-inventor who stated that "the typical engineering person or design person would have a certain vision in their head about what a pin looks like, and I would say that's a subset of a protuberans." (ECF No. 46, at 15 (citations omitted).)

The Court notes that Figures 5 and 5a, and Figures 8 and 9, represent two "alternative embodiment[s]" of the invention. Limitations in specific alternative embodiments generally do not limit the claims themselves. *Phillips*, 415 F.3d at 1323. As the Court has previously noted, though friction is one way in which the invention could work, there is no indication that it is the only way it could work. Additionally, nothing in the specification or claim language supports Razer's limitation that the protuberance must be made of the "material of the interior of the ergonomic extension" as it could be made of a different type of material. Finally, there is no support for Razer's contention that the protuberance must "extend[] into the slot." That proposed limitation again comes from an alternative embodiment. All the claims require is that the protuberance be "adjacent to the slot" and "engage[] with" the "notches." Razer has not provided any support outside of an alternative embodiment for limiting this engagement to require friction or insertion into the slot.

With regards to "protuberance," there is support for either "bulg[ing] beyond the surrounding surface," as Razer urgers, or "protrud[ing]," as Mad Catz urges. The protuberance clearly extends beyond the area of the invention that surrounds it. Between these two definitions, the term "bulges" implies a more rounded object and thus the term "protrudes," which does not carry this connotation, is more appropriate.

However, the Court rejects Mad Catz's full definition as the term "anything, such as a knob, pin, or a screw" is too open-ended, specifically the use of the term "anything" because the "protuberance" is a physical object. Thus the Court rejects both proposed constructions and instead construes "protuberance" to mean "an object that protrudes."

Accordingly, the Court construes the term "protuberance" to mean "an object that protrudes" and construes the term "adjacent to the slot" to have its plain and ordinary meaning. The Court **does not limit** these terms to mean that the protuberance must be made of the material of the interior of the ergonomic extension, must extend into the slot, or must be shaped so as to be able to frictionally engage with any of a plurality of the notches in the extension arm.

### 6. "notches on the extension arm"

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
| --- | --- |
| "Notches" and "on the extension arm" should be defined separately. | "indentations in the extension arm that are shaped so as to be frictionally engageable with the protuberance in the slot." |

### a. "notches"

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
| --- | --- |
| "indentation, hole, or concave opening of any shape capable of engaging a protuberance." | Should be defined in conjunction with "on the extension arm." |

### b. "on the extension arm"

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning. | Should be defined in conjunction with "notches." |

The term "notches on the extension arm" appears in claims 1 and 2 of the '370 patent. The parties again dispute whether the claims should be limited to friction.

### c. Claim Language/Specification

The claims state that "the protuberance engage[s] with any of the plurality of notches." '370 Patent, 6:43. The specification states that "[a] preferred locking means

includes a protuberance on the extension arm and a plurality of notches adjacent to the slot." *Id.* at 2:30–32. The alternative embodiment in Figure 5 describes the notches as "defin[ing] selected adjustment positions for palm support tail extension 100a" and that "[t]he protuberance engages with one of the notches on extension arm 102 to lock extension 100a into a desired position." *Id.* at 4:34–44. Finally, Figure 5 notes that "the protuberance may be located on extension arm 102, and the notches located in the slot." *Id.* at 4:51–53.

### d. Extrinsic Evidence

Based on the alternative embodiments, Razer's expert opines that the protuberance must "frictionally engage" with the notches. (ECF No. 47-9 ¶ 42–43.) Razer's expert further opines that, based on Webster's Third New International Dictionary, Unabridged, (1993), a person of ordinary skill in the art would have understood the term "notch" to mean ""a V-shaped indentation or hollow (as in a surface or edge)," which is the exact definition from that dictionary. (ECF No. 47-9 ¶ 48.) Mad Catz contends that

As discussed several times above, the Court rejects the frictional limitation argued by Razer. That limitation is contained in an alternative embodiment and there is no indication that other embodiments that do not use frictional engagement are not possible. Moreover, the claims themselves indicate no such limitation.

With regards to "notches," Mad Catz concedes that the parties "agree that the commonly accepted meaning of 'notch' is an indentation." (ECF No. 46, at 17.) However, Mad Catz does not appear to provide support for its additional meanings of "hole" and "concave opening." (*See id.*) Citing *Riddell, Inc. v. Schutt Sports, Inc.*, No. 08-cv-0071-BBC, 2009 WL 2045941, at *4, *7 (W.D. Wis. Jul. 10, 2009), Mad Catz argues that the definition should be appended to add "of any shape." (ECF No. 46, at 17.) In *Riddell*, one of the proposed constructions implied that the indentations could be either V-shaped or U-shaped. 2009 WL 2045941, at *3–4. The *Riddell* court found this too limiting and thus defined "notches" as "indentations of any shape." *Id.* The

Court agrees that "indentation" is the appropriate definition and rejects Mad Catz addition of "hole" and "concave opening" because there is no support for those terms in the evidence. However, the Court agrees with the addition of "of any shape" because the Court has already rejected the shape limitation urged by Razer and there is no indication in the claims or specification that the shape is limited in any way other than so it can engage with the protuberance.

With regards to "on the extension arm," Razer essentially defines this as "in the extension arm," but does not provide any support for changing the preposition. As the Court does not find that this limitation is supported by the claim language, the Court rejects this limitation.

Accordingly, the Court construes the term "notches" to mean "indentations of any shape" and construes the term "on the extension arm" to have its plain and ordinary meaning, The Court **does not limit** these terms to mean that notches must be in the extension arm or that the notches must be shaped so that they can frictionally engage with the protuberance

**B. '063 Patent**

The '063 patent discloses a "device lighting apparatus and method" which comprises: (1) "a key operable for communicating with a computing device," (2) "a light emitting device for lighting the key," and (3) "a selector operable for selecting between a plurality of lighting schemes." '063 Patent Abstract. Essentially, the ''063 patent discloses a computer input device that has keys, such as a keyboard or gaming controller, and those keys can be lit in different ways that allow users to tell the difference between keys in low ambient light conditions. *See id.* The application for the '063 patent was filed on August 30, 2007, and the patent was issued on December 10, 2013.[3] Razer is asserting only independent Claim 1 and dependent Claims 2–5, 8, 10,

---

[3] For the '063 Patent, Razer's expert defines a person of ordinary skill in the art as someone with "a bachelor's degree in cognitive science, ergonomics, industrial design, computer user interface design or an equivalent degree, and at least 2 years of demonstrated real-world experience in the field of computer user interface

1  and 12. (ECF No. 47, at 19.)

2  **1. "plurality of keys"**

3  The term "plurality of keys" appears in asserted Claims 1, 2, 5, and 10 of the

4  '063 patent. The parties agree that the construction of this term is "two or more keys."

5  (ECF No. 39, at 21.) Accordingly, the Court construes the term "plurality of keys" to

6  mean "two or more keys."

7  **2. "each of the"**

8  The term "each of the" appears in asserted Claim 1 of the '063 patent. The

9  parties agree that the construction of this term is "each and every one (i.e., all)." (ECF

10  No. 39, at 21.) Accordingly, the Court construes the term "each of the" to mean "each

11  and every one (i.e., all)."

12  **3. "at least one of . . . and"**

13

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
|---|---|
| Conjunctive: | Disjunctive: |
| Claims 1 and 10 – "at least one colour, at least one of intensity, and at least one of duration" | Claims 1 and 10 – "at least one colour one intensity or one duration" |
| Claim 2 – "at least one of back-lighting the key and at least one of permeating light throughout at least a portion of the key" | Claim 2 – "at least back-lighting the key or permeating light throughout a portion of the key" |
| Claim 5 – "at least one of an alphanumeric key, at least one of a numeric key, and at least one of a command key" | Claim 5 – "at least one alphanumeric, numeric, or command key" |

23  Independent Claim 1 and dependent Claim 10 include the phrase "at least one

24  of colour, intensity and duration," which refers to the possible lighting schemes. '063

---

26  design,computer ergonomics and/or industrial design" or with "expertise in and
appreciation of human factors in computing systems as well as sufficient knowledge
27  of hardware and software technology to be able to specify and/or direct engineer(s) in
the building of systems to human-computer interaction specifications." (ECF No. 47-9,
at 7.) Mad Catz does not offer a definition of a person of ordinary skill in the art. The
28  Court finds that Razer's definition is reasonable and therefore adopts Razer's definition
of a person of ordinary skill in the art.

Patent, 6:15–17, 6:46–47.[4] Dependent Claim 2 includes the phrase "at least one of back-lighting the key and permeating light throughout at least a portion of the key," which refers to the method by which the keys are lit. *Id.* at 6:22–23. Dependent Claim 5 includes the phrase "at least one of an alphanumeric, a numeric and a command key," which refers to the type of keys. *Id.* at 6:30–31.The dispute between the parties is whether the phrase "at least one of . . . and" connotes a conjunctive list or a disjunctive list. (ECF No. 47, at 20.) Mad Catz argues that this always connotes a conjunctive list (i.e., there must be at least one of each item in the list). (ECF No. 46, at 19.) Razer argues that it is always disjunctive. (ECF No. 47, at 20.)

### i. Claim Language/Specification

First, with regards to Claims 1 and 10, the specification repeatedly and unambiguously refers to"colour, intensity and duration" in the conjunctive. *See, e.g.*, '063 Patent, 3:61, 4:30–31, 5:26, 5:43. In Figure 2, the specification states that "[t]he lighting schemes further define the colour, intensity and duration of each group of keys 202." *Id.* at 4:30–31. In Figure 3, the specification states that "[m]ore specifically, each of the plurality of lighting schemes defines the colour, intensity and duration of the lighting of the one or more keys 102." *Id.* at 5:24–27. Additionally, the specification indicates that "[t]he data signals contain data corresponding to the colour, intensity and duration of the lighting of the key 102." *Id.* at 3:60–62.

Second, with regards to Claim 2, in describing Figure 1, the specification discusses two ways in which a key can be lit: permeation and back-lighting. With regards to permeation, the specification states:

> The light emitting device 108 is preferably disposed within the key 102. The key 102 preferably has a portion that allows light 106 to permeate therethrough so that when the light emitting device 108 is activated to emit light 106, the light 106 is able to permeate through the portion of the key 102. In this manner, the key 102 is lighted by the light 106 emitted from the light emitting device 108.

*Id.* at 3:28–34. With regards to backlighting, the specification next states:

---

[4] This phrase is part of a larger disputed phrase in Claim 1 that the Court discusses in further detail below.

"Alternatively, the light emitting device 108 is positioned adjacent or underneath the key 102 such that the key 102 is back-lightable by the light emitting device 108." *Id.* at 3:35–37. Essentially, the difference between these methods is whether the light emitting device is located within the key itself (permeation) or located adjacent or underneath the key (back-lighting).

Third, with regards to Claim 5, in describing Figure 1, the specification states that "the key 102 is preferably an alphanumeric, a numeric or a command key." *Id.* at 3:20–21.

### ii. Extrinsic Evidence

With regards to Claim 5, Razer's expert opines that "on a keyboard, a key is usually either an alphanumeric key, a numeric key, or a command key, not all three at once" and thus a person of ordinary skill the art "would have understood 'at least one of . . . and' in Claim 5 to be in the disjunctive." (ECF No. 47-9 ¶ 65.) Mad Catz responds that "the point of a patent is to create something novel, not just to repeat the 'usual.'" (ECF No. 46, at 21.) Mad Catz further references Razer's Lycosa Keyboard which contains keys that have both functions and numbers (e.g., "9/Pg Up" and "8/Up Arrow"). (*See* ECF No. 46-1, Ex. F, at 50–51.)

Citing *SuperGuide Corp. v. DirecTV Enters.*, 358 F.3d 870, 885–88 (Fed. Cir. 2004), Mad Catz argues that the conjunctive construction is appropriate. In *SuperGuide*, the Federal Circuit construed three "at least one of . . . and" phrases to be conjunctive: (1) "at least one of a desired program start time, a desired program end time, a desired program service, and a desired program type"; (2) "at least one of program start time, program end time, program service, and program type"; and (3) "at least one of the desired program start time, the desired program end time, the desired program service, and the desired program type." 358 F.3d at 884. The Federal Circuit relied on a grammar treatise and noted "that nothing in the specification rebuts the presumption that the '211 patentee intended the plain and ordinary meaning of this language" and that "[e]very disclosed embodiment teaches that the user must choose

a value for each designated category." *Id.* at 886–87 (citation omitted). However, as other courts have noted "*SuperGuide* did not erect a universal rule of construction for all uses of 'at least one of' in all patents" because "the *SuperGuide* court's construction of 'at least of' [sic] was based on the particular facts of the particular patent at issue there." *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-cv-3587-WHO, 2015 WL 1265009, at *8 (N.D. Cal. Mar. 19, 2015) (collecting cases). Thus whether "at least one of . . . and" is conjunctive or disjunctive depends on the patent itself and can even vary within a single patent depending on the context. As the Court discusses below, the specification and other factors here distinguish "at least one of . . . and" in Claims 2 and 5 from the limitation in *SuperGuide*, but the specification and other factors make "at least one of . . . and" in Claims 1 and 10 similar to the limitation in *SuperGuide*.

With regards to the lighting scheme in Claims 1 and 10, the Court finds that the list is conjunctive. First, the specification indicates that the data signal referenced in Claim 10 contains data for "colour, intensity *and* duration"; there is no indication that the signal would contain data for just one of the three options. Second, the specification notes that in the embodiments in Figures 2 and 3 have lighting schemes that contain "colour, intensity *and* duration"; there is no indication that a lighting scheme can have just one of these options. Finally, the lists in Claims 1 and 10 refer to a "group of keys" and a "plurality of keys" which reinforces the conjunctive construction. Because multiple keys can be lit, multiple colors, durations, and intensities could be chosen where different options would apply to each key.

With regards to the lightning techniques in Claim 2, the Court finds that the list is disjunctive. The two types of lighting, permeation and back-lighting, are indicated as alternatives by the specification. Moreover, a conjunctive construction of Claim 2 would be nonsensical as it would not make sense that there could be two or more back-lighting of a key or two or more permeation of light through at least a portion of the key. Unlike colors, durations, or intensities, a key is either back-lit or it is not, whereas there are such things as multiple colors or multiple durations or multiple intensities.

Finally, this list specifically refers to a single key—the claim language states "one of the plurality of keys" and "the key"—which makes sense that the list would be disjunctive and refer to a single option per key. This is in contrast to the lists in Claims 1 and 10, that refer to a "group of keys" or "plurality of keys," where it makes sense that multiple options within the list could be selected because each key could have a separate value for the options in those lists.

With regards to the key types in Claim 5, the Court finds that the list is disjunctive. Though Mad Catz argues that a combination of these key types is possible, its construction would require that every single key be a combination of alphanumeric, numeric, and command, which does not fit with how a person of ordinary skill in the art would construe the types of keys on a keyboard since many keys include only a single of the above options.

Accordingly, the Court construes "at least one of colour, intensity and duration" in Claims 1 and 10 to mean "at least one colour, at least one intensity, and at least one duration." The Court construes "at least one of back-lighting the key and permeating light throughout a portion of the key" in Claim 2 to mean "at least back-lighting the key or permeating lighting through at least a portion of the key." The Court construes "at least one of an alphanumeric, a numeric and a command key" to mean "at least an alphanumeric, a numeric, or a command key."

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

**4. "each of the plurality of lighting schemes defining at least one of colour, intensity and duration of the lighting of a predetermined group of keys which are usable in accordance with a corresponding mode of an application running on the computing device"**

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
|---|---|
| "each of the plurality of lighting schemes, **which each set the lighting of certain keys,** defining at least one of colour, intensity and duration of the lighting of a predetermined group of keys which are usable in accordance with a corresponding mode of an application running on a computing device, **such that each of the usable keys are backlighted and, thereby, differentiated from any nonusable keys, which are not backlighted, as selected by the corresponding software mode"[5]** | "each of the plurality of lighting schemes defining at least one colour or one intensity or one duration of the lighting of a predetermined group of keys which are usable in accordance with an operating mode of a running computer application, **such that the predetermined group of keys are differentiated from other keys that are functionally distinct from the predetermined group of keys during the present operating mode"** |

The phrase "each of the plurality of lighting schemes defining at least one of colour, intensity and duration of the lighting of a predetermined group of keys which are usable in accordance with a corresponding mode of an application running on the computing device" appears in disputed Claim 1 of the '063 patent. The parties also dispute two phrases that appear within this larger disputed phrase: "at least one of . . . and"; and "which are usable."

**a. "at least one of . . . and"**

As discussed above, the Court construes this phrase in Claim 1 to be conjunctive and mean "at least one colour, at least one intensity, and at least one duration."

/ /

/ /

/ /

---

[5] Mad Catz had initially proposed the construction that referenced "game mode." (ECF No. 50, at 9–10.) However, in response to Razer's arguments regarding that phrase, Mad Catz revised their construction to more broadly refer to any computing application, not just games. (*Id.*)

**b. "which are usable"**

| Mad Catz's Proposed Construction | Razer's Proposed Construction |
|---|---|
| "which are usable for a particular game mode, as differentiated and set apart from those keys which are not usable or provide no function during the particular game mode" | Plain and ordinary meaning. |

**c. Claim Language/Specification**

In referencing a schematic view in Figure 1, the specification states "[t]he colours for indicating the availability of different functions on the game-pad are preferably programmable by the user." '063 Patent, 4:63–64. Using a game as an example, the specification further states "a game application has predefined lighting schemes relating to different game modes in a game. When the game progresses from one game mode to another, the game application selects the lighting scheme that corresponds with the current game mode for lighting the key 102." *Id.* at 4:10–13.

**d. Prosecution History**

Mad Catz notes that "following the examiner's initial rejection of the patent application, the patentee amended its claims to clarify this point: 'the plurality of lighting schemes is configured to light up a predetermined group of keys which are usable in accordance with a corresponding mode of an application running on the computing device.'" (ECF No. 46, at 24; ECF No. 46-1, Ex. G, at 62.) Razer responds that there has been "no clear and unmistakable disavowal of claim scope." (ECF No. 49, at 10 (quoting *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1346 (Fed. Cir. 2013) (Federal Circuit "precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable. The prosecution history at issue here does not rise to that level.") (quotations omitted)).) Razer further points to the prosecution history, arguing that the patentees sought "to provide a peripheral input device which allows a user to differentiate usable keys found on input devices, under

low ambient light conditions" and distinguished their patent from Hyatt[6] because "Hyatt does not disclose the usage of lighting schemes or effects to highlight different keys or groups of keys for operation." (*Id.*)

### e. Extrinsic Evidence

The Court finds support for Mad Catz's limitation that the lighting schemes "each set the lighting of certain keys." Razer does not appear to respond to this limitation. (*See* ECF Nos. 47, 49.) Though the claims could be argued to include lighting schemes that light no keys, such as if the duration or intensity were set to zero, the specification notes the invention is designed to "allow a user to differentiate usable keys found on input devices under low ambient light conditions." This precludes lighting schemes that light no keys since users would not be able to differentiate if there is no light from any of the keys.

However, with regards to Mad Catz's proposed backlighting limitation, the Court finds no support for that limitation. The specification specifically envisions both back-lighting and permeation and nothing in Claim 1 suggests that permeation is not a possible lighting method. The Court also finds no support for Mad Catz's proposed "any nonusable" limitation and Razer's "functionally different" limitation. While the claim language requires that the "predetermined group of keys" be "usable," Claim 1 contains no requirement that the keys outside of the predetermined group cannot be usable. Moreover, Mad Catz's limitation introduces the term "nonusable" and "no function" without any support. The Court agrees with Razer that a person of ordinary skill in the art would have understood that certain keys may not be "usable" for a certain application but could still be usable and have function, even though that function would not relate to the application mode (e.g., the Windows key on a keyboard designed for Microsoft Windows). Finally, the Court does find support for Razer's limitation that application mode must be the "present operating mode." While

---

[6] During the prosecution history, "the Patent Examiner rejected claim 1 as being unpatentable over a reference authored by Hyatt." (ECF No. 47-9 ¶ 74.)

Claim 1 requires that there be a "corresponding mode," the specification's only reference to the "present" mode is in an embodiment that gives an example where "the game application selects the lighting scheme that corresponds with the current game mode for lighting the key 102." The specification then gives an alternative where the user defines the lighting schemes and selects them via a selector. '063 Patent Specification ("Further alternatively, the lighting schemes are definable by a user using the computing device 104. The lighting schemes defined by the user are downloadable for storage in a memory of the apparatus 100. The selector 110 is for selecting one of the lighting schemes in the memory for lighting the light emitting device 108.").

Accordingly, the Court construes the term "each of the plurality of lighting schemes defining at least one of colour, intensity and duration of the lighting of a predetermined group of keys which are usable in accordance with a corresponding mode of an application running on the computing device" to mean "each of the plurality of lighting schemes, which each set the lighting of certain keys, defining at least one colour, at least one intensity, and at least one duration of the lighting of a predetermined group of keys which are usable in accordance with a corresponding mode of an application running on the computing device." The Court also construes the term "which are usable" to have its plain and ordinary meaning. The Court **does not limit** these terms to mean that the keys must be backlit, that the differentiated keys must be nonusable, be functionally different, or have no function, that the usability of keys must be selected by the software mode, that the software mode must be the present mode, or that keys outside of the predetermined group must be functionally different.

**IT IS SO ORDERED.**

DATED:  June 25, 2015

HON. GONZALO P. CURIEL
United States District Judge