UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAD CATZ INTERACTIVE, INC., an Ontario corporation,<br><br>      Plaintiff/Counterclaim Defendant,<br><br>v.<br><br>RAZER USA, LTD, a Delaware corporation,<br><br>      Defendant/Counterclaim Plaintiff. | Case No.:  3:13-cv-2371-GPC-JLB<br><br>**ORDERING GRANTING RAZER USA, LTD'S MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,157,370**<br>[ECF No. 59] |

On September 2, 2015, Defendant Razer USA, Ltd. ("Razer") filed the instant motion for summary judgment of non-infringement of U.S. Patent No. 6,157,370 (the "'370 Patent").  (Mot. Summ. J., ECF No. 59.)  Plaintiff Mad Catz Interactive, Inc. ("Mad Catz") filed an opposition on October 2, 2015 (Opp'n, ECF No. 62) and Razer filed a reply on October 16, 2015 (Reply, ECF No. 64).  On December 4, 2015, the Court held a hearing on Defendant's motion.  The Court's Claim Construction Order ("Order") issued on June 25, 2015, provides the basis for the non-infringement determinations contained herein.  (*See* Order, ECF No. 58.)  Based on the Court's claim construction, the papers and oral argument submitted by counsel, and for the reasons set for below, the Court **GRANTS** Defendant's motion for summary judgment of non-infringement.

//

1

# I.    BACKGROUND

## A.    The '370 Patent

The '370 patent, entitled "Ergonomic Mouse Extension," discloses a "computer pointing device." ('370 Patent Abstract, ECF No. 1-2.)  The computer pointing device includes "a conventional computer mouse" and "an ergonomic extension." (*Id.*)   The ergonomic extension "is attached to the computer mouse for movement therewith and is positioned adjacent to the computer mouse for facilitating the use of the mouse in an ergonomically correct position."  ('370 Patent 2:15-18.)  The three independent claims of the '370 Patent—Claims 1 and 2 at issue in this litigation—each disclose a different way to move and adjust the ergonomic extension relative to the mouse.  (*See id.* 6:17-8:20.) The application for the '370 Patent was filed on December 11, 1996, and the patent was issued on December 5, 2000.  (*Id.* at 1.)  It is a continuation-in-part of a prior application, which dates back to January 3, 1996.  (*Id.* 1:5-7.)

### 1.  Claim 1

Claim 1 discloses:

"A computer pointing device which comprises:
a computer mouse;
an ergonomic extension adapted to support a human palm, the ergonomic extension being attached [to the] computer mouse for movement therewith and positioned adjacent to the computer mouse for use thereof by a user in an ergonomically correct position; and
means for adjusting the position of the computer mouse relative to the ergonomic extension for enabling use of the computer mouse and ergonomic extension by users having different size hands, wherein the means for adjusting the position of the computer mouse relative to the ergonomic extension comprises:
an extension arm fixed to the computer mouse and extending outwardly therefrom;
a slot in the ergonomic extension adapted to receive the extension arm for slidable movement of the extension arm therein; and
locking means for releasably locking the extension arm in any of a plurality of positions in the slot wherein the locking means comprises:
a) a protuberance on the extension arm and a plurality of notches adjacent to the slot, the protuberance engaging with any of the

2

plurality of notches; or

    b) protuberance adjacent to the slot and a plurality of notches on the extension arm, the protuberance engaging with any of the plurality of notches."

(*Id.* 6:17-46.)

### 2. Claim 2

Claim 2 discloses:

"A computer pointing device which comprises:

a computer mouse;

an ergonomic extension adapted to support a human palm, the ergonomic extension being attached [to the] computer mouse for movement therewith and positioned adjacent to the computer mouse for use thereof by a user in an ergonomically correct position; and

means for adjusting the position of the computer mouse relative to the ergonomic extension for enabling use of the computer mouse and ergonomic extension by users having different size hands, wherein the means for adjusting the position of the computer mouse relative to the ergonomic extension comprises:

an extension arm extending between the computer mouse and the ergonomic extension;

a slot in the computer mouse or the ergonomic extension adapted to receive the extension arm for slidable movement therein; and

locking means for releasably locking the extension arm in any of a plurality of positions in the slot wherein the locking means comprises:

    c) a protuberance on the extension arm and a plurality of notches adjacent to the slot, the protuberance engaging with any of the plurality of notches; or

    d) a protuberance adjacent to the slot and a plurality of notches on the extension arm, the protuberance engaging with any of the plurality of notches."

(*Id.* 6:47-7:7.)

### B.   The Accused Products

The accused products are two versions of Razer's Ouroborous Elite Ambidextrous Gaming Mouse devices made, used, offered for sale, sold in, or imported into the United States since the '370 Patent issued.  (Compl. ¶ 14, ECF No. 1; Block Decl., Ex. 2 (Mad Catz Interactive, Inc.'s Amended Disclosure of Asserted Claims and Infringement

Contentions dated July 27, 2015 ("AIC")), ECF No. 59-4.)

As depicted below, both of the accused devices comprise two separate pieces, the smaller of which Razer refers to as the "adjustable palm rest and rear panel." (Mot. Summ J., Declaration of Alan P. Block ("Block. Decl."), Ex. 3 (Ouroboros Product Guide) at 2, ECF No. 59-5.)



"Adjustable palm rest and rear panel"

**FIGURE 1[1]**

The two accused Ouroboros devices differ in how the two pieces engage with each other. (Mot. Summ J., Declaration of Eric J. Gould Bear ("Bear Decl.") ¶ 33, ECF No. 59-13.) In Version 1, there are two pins at one end of the smaller piece that engage with one of a plurality of circular holes in the other piece. (*Id.* ¶ 34.) In Version 2, there are two screws at one end of the smaller pieces that engage with one of a plurality of threaded circular holes on the other piece. (*Id.*) In both versions, the larger of the two pieces contains the motion-sensing component which controls the cursor's position on a computer display based on the position or movement of the mouse on a surface. (*Id.* ¶ 32.) The figures below depict the pins/screws and holes in each version and the motion-sensing component common to both versions:

---

[1] Diagrams copied by Razer from Mad Catz' AIC (AIC, Ex. 2 at 2, 6, ECF No. 59-4), with the label "adjustable palm rest and rear panel" and green arrows added by Razer. (Mot. Summ. J. at 3, ECF No. 59.)



**FIGURE 2[2]**

## II.  PROCEDURAL POSTURE

Mad Catz contends that the accused products infringe Claims 1 and 2 of the '370 Patent.  Both Claims 1 and 2 are independent claims.  Defendant moves for summary judgment of non-infringement following the Court's construction of relevant disputed terms.

On August 20, 2014, the Court held a claim construction ("*Markman*") hearing.  (*See*

---

[2] Diagrams copied by Razer from Mad Catz' AIC (AIC, Ex. 2 at 8, 9, ECF No. 59-4), with the labels and green arrows added by Razer.  (Mot. Summ. J. at 4, ECF No. 59.)

Minute Entry, ECF No. 53; Hr'g Tr., ECF No. 55.)  With respect to the '370 Patent, the Parties disputed the construction of six claim terms: (1) "a computer mouse"; (2) "an extension arm fixed to the computer mouse and extending outwardly therefrom"; (3) "an extension arm extending between the computer mouse and the ergonomic extension"; (4) "releasably locking the extension in any of a plurality positions in the slot"; (5) "protuberance adjacent to the slot"; and (6) "notches on the extension arm."  (*See* Order at 1-18, ECF No. 58.)

       Specifically, the Court has construed disputed terms as follows:

| **Disputed Term** | **Construction** |
| --- | --- |
| "a computer mouse" | "a hand-graspable cursor control device comprising a motion-sensing component such that the position or movement of the mouse on a surface controls the position of a cursor on a display" |
| "an extension arm fixed to the computer mouse and extending outwardly therefrom" | "an extension arm fixed to the **rear of** computer mouse and extending outwardly therefrom" |
| "an extension arm extending between the computer mouse and the ergonomic extension" | "an extension arm extending between **the rear of** the computer mouse and the ergonomic extension" |
| "releasably locking the extension arm in any of a plurality of positions in the slot" | Plain and ordinary meaning |
| "protuberance" | "an object that protrudes" |
| "adjacent to the slot" | Plain and ordinary meaning |
| "notches" | "indentations of any shape" |
| "on the extension arm" | Plain and ordinary meaning |

(*See* Order, ECF No. 58.)

//

The Court also determined that the claim language indicates that "the ergonomic extension," which includes the "extension arm," is separate from the "computer mouse" as both of those objects are listed as separate elements comprising the "computer pointing device" in Claim 1. (Order at 6, ECF No. 58.) The Court further determined that the claim language stating that the "extension arm" is "fixed to the computer mouse and extend[s] outwardly therefrom" and that the "extension arm extend[s] between the computer mouse and ergonomic extension" further indicates that the "computer mouse" does not itself include the "extension arm." (*Id.* at 6, 9.) In holding that the term "notches" means "indentations of any shape," the Court rejected Mad Catz' "addition of 'hole' and 'concave opening' because there is no support for those terms in the evidence." (*Id.* at 17-18.)

## III.   LEGAL STANDARD

### A.   Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 447 U.S. 317, 322-23 (1986). Where a defendant seeks summary judgment of non-infringement, "nothing more is required than the filing of a . . . motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused [products] did not meet the claim limitations." *Exigent Tech. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309 (Fed. Cir. 2006). The burden of production then shifts to the patentee to "identify genuine issues that preclude summary judgment." *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 990 (Fed. Cir. 2006). Infringement, both literal and under the doctrine of equivalents, is a question of fact, and thus "is amenable to summary judgment where, inter alia, no reasonable fact finder could find infringement." *Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998). If the parties do not dispute any relevant facts regarding the accused product, "but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment." *Gen. Mills, Inc. v. Hunt–Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997). Nevertheless,

as with all summary judgment motions, the court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000).

## B.   Literal Infringement

In order to establish a prima facie case of direct infringement, a plaintiff must show that the moving defendant makes, uses, sells, offers to sell, or imports a product that infringes at least one asserted claim. *See* 35 U.S.C. § 271(a); Markman *v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).   To determine infringement, the asserted claim must be compared to the allegedly infringing method or device. *Id.*   An infringement analysis entails two steps: (1) determining the meaning and scope of the patent claims; and (2) comparing the construed claims to the devices accused of infringing. *Id.*   To establish literal infringement, every claim limitation, or claim element, must be found in the accused subject matter. *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29, 40 (1997).   Thus, establishing that the accused method or device does not support one claim limitation would support a finding of non-infringement. *Id.*   The patentee must prove infringement by a preponderance of the evidence. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000).

## C.   Doctrine of Equivalents

Under the doctrine of equivalents, a product that does not literally infringe a patent claim may still infringe if each and every limitation of the claim is literally or equivalently present in the accused device. *See Warner-Jenkinson,* 520 U.S. at 40 ("In our view, the particular linguistic framework used is less important than whether the test is probative of the essential inquiry: Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?").

Whether an element of an accused product infringes under the doctrine of equivalents depends in part on whether that component performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result. *See Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d

1309, 1315 (Fed. Cir. 1998); *Pennwalt Corp. v. Durand-Wayland, Inc.,* 833 F.2d 931, 934-35 (Fed. Cir. 1987) (en banc) ("Under the doctrine of equivalents, infringement may be found (but not necessarily) if an accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention.").  If the differences between a claim and an accused device are "insubstantial" to one with ordinary skill in the art, the product may infringe under the doctrine of equivalents.  *See Ethicon,* 149 F.3d at 1315; *Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1423 (Fed. Cir. 1997).  The doctrine prevents an accused infringer from avoiding infringement by changing minor details of a claimed invention while retaining its essential functionality.  *See Sage,* 126 F.3d at 1424.

## IV.   DISCUSSION

Razer moves for summary judgment of non-infringement on two grounds.  First, Razer contends that no reasonable juror could find that the accused Ouroboros devices, either literally or under the doctrine of equivalents, include the requisite Claim 1 limitation of "an extension arm fixed to the computer mouse and extending outwardly therefrom" or, alternatively, the Claim 2 limitation of an "extension arm extending between the computer mouse and the ergonomic extension."  (Mot. Summ. J. at 9-21, ECF No. 59.)  Second, Razer argues that, even assuming that a reasonable juror could find that the Ouroboros devices, either literally or under the doctrine of equivalents, have "extension arms," no reasonable juror could find that the Ouroboros devices include a "plurality of notches on the extension arm" as required for the locking mechanism claimed in both Claims 1 and 2.  (*Id.* at 22-26.)  Mad Catz responds that the accused devices contain—literally and under the doctrine of equivalents—both the "extension arm" and "notches on the extension" arm elements of Claims 1 and 2 and that resolution of this factual dispute cannot be decided on a motion for summary judgment.  (Opp'n at 1, 5-7, ECF No. 62.)

### A.   Lack of "Extension Arm"

Both Claims 1 and 2 of the '370 Patent disclose

"A computer pointing device which comprises:

9

1     a computer mouse;

2     an ergonomic extension adapted to support a human palm . . .; and

3     means for adjusting the position of the computer mouse relative to the
        ergonomic extension . . . wherein the means for adjusting the position of

4         the computer mouse relative to the ergonomic extension comprises
        [either]:

5         • an extension arm fixed to the computer mouse and extending
          outwardly therefrom (Claim 1); . . . .

6         • an extension arm extending between the computer mouse and the

7           ergonomic extension (Claim 2); . . . .

8   ('370 Patent Abstract 6:17-7:7, ECF No. 1-2.)

9       Razer contends that based on the Court's construction that the "ergonomic

10 extension" is separate from the "computer mouse" and that the "computer mouse" does not

11 include the "extension arm," the accused devices lack the required "extension arm" both

12 literally and under the doctrine of equivalents.  (Mot. Summ. J. at 10, ECF No. 59.)

13       **1.  Literal Infringement**

14       Literal infringement requires that every limitation set forth in a properly interpreted

15 claim be found in an accused product or process.  *Warner-Jenkinson Co., Ltd.*, 520 U.S. at

16 17.  An infringement analysis entails two steps: (1) determining the meaning and scope of

17 the patent claims; and (2) comparing the construed claims to the devices accused of

18 infringing.  *Markman*, 52 F.3d at 976.  Establishing that the accused method or device does

19 not support one claim limitation would support a finding of non-infringement.  *Warner-*

20 *Jenkinson Co.*, 520 U.S. 17 at 29, 40.

21       In this case, Claims 1 and 2 of the '370 patent essentially contain three limitations:

22 (1) a computer mouse; (2) an ergonomic extension; and (3) an extension arm which

23 provides the means for the position of the ergonomic extension to be adjusted relative to

24 the computer mouse.  There is little dispute as to the presence of the first two limitations.

25 The computer mouse and ergonomic extension are present in the Ouroboros.  The disputed

26 limitation relates to the meaning and scope of "extension arm."  Razer argues that the

27 accused devices do not infringe Claims 1 and 2 because they lack the "extension" arm

28 required by Claims 1 and 2.  Razer relies on the Court's construction of a "computer

1   mouse" and the position of the "extension arm" relative to the "computer mouse."

2       Razer maintains that the "computer mouse" is the larger of the two pieces comprising

3   the Ouroboros devices and characterizes the smaller of the two pieces as the "adjustable

4   palm rest and rear panel."  (*Id.* at 10-11.)

5

6

7

8

9

10

11                              **FIGURE 3**

12  Razer refers to the Court's construction of a "computer mouse" as "a hand-graspable cursor

13  control device comprising a motion-sensing component such that the position or movement

14  of the mouse on a surface controls the position of a cursor on a display."  (*Id.*)  Razer states

15  that the "motion-sensing component" is a "laser sensor on the bottom surface of the

16  computer mouse."  (*Id.* at 11-12 (citing Block Decl. Ex. 3 (Ouroboros Product Guide) at 2,

17  ECF No. 59-4).)

18

19

20

21

22

23

24

25

26

27

28                              **FIGURE 4**

1   Razer further states that the material of the computer mouse and the rear of the

2   computer mouse is "necessary to the operation of the 'computer mouse' as a cursor control

3   device because that is where, among other things, the battery is stored" as shown below.

4   (Mot. Summ. J. at 12-13, ECF No. 59.)

 

**FIGURE 5**

13   Razer argues that, in light of the fact that the Court did not provide constructions for

14   the terms "extension arm," "extending outwardly thereto," and "fixed," the plain and

15   ordinary meaning of these terms applies.  (*Id.* at 13.)  Razer relies on Webster's Third New

16   International Dictionary (unabridged) (1993) ("Webster's") definitions of "**arm**" as "9a: a

17   lateral usu. horizontally extended attachment or device" (Block. Decl., Ex. 4) and

18   "**extension**" as "7a: a part that is extended from or attached to a main body or section as

19   an addition, supplement, or enlargement . . . a section that forms an additional length (Block

20   Decl., Ex. 5).  (Mot. Summ. J. at 13, ECF No. 59.)  Razer further argues that the plain and

21   ordinary meaning of "**extending outwardly therefrom**" in the context of this claim phrase

22   means that "the extension arm extends from the **rear** from the computer mouse so as to be

23   outside of (or beyond) the rear of the computer mouse." (*Id.* at 14.)  In reaching that

24   interpretation Razer relies on the '370 Patent's Figure 5a and Webster's definition of

25   "**outwardly**" as "1a: on the outside; externally" (Block Decl., Ex. 6) and "**therefrom**" as

26   "from that: from it" (*id.*, Ex. 7).  (Mot. Summ. J. at 14 n. 25, ECF No. 59.)  Razer further

27   relies on Webster's definition of "**fix**" to mean "1c(1): fasten, attach, affix" (Block Decl.,

28   Ex. 8) and *Regents of the University of Minnesota v. AGA Medical Corp.*, 717 F.3d 929,

938 (Fed. Cir. 2013) and argues that the plain meaning of the term "**fixed**" connotes that, prior to being "fixed" to the rear of the computer mouse, the "extension arm" and the computer mouse "existed as individual, physically-separate elements."  (*Id.* at 14.)

Razer contends that there is no "extension arm" that literally meets the requirements for the "extension arm" of either claims.  Defendant posits that the rear of both version of the accused devices is shown below by green lines:



Rear of the "Computer Mouse" (indicated by the green lines)

**FIGURE 6**[3]

Razer argues that these photos unequivocally demonstrate that "there are **no structures** that extend from the rear of the computer mouse as to be outside of (or beyond) the rear of the computer mouse or that extend between the rear of the computer mouse and the ergonomic extension."  (Mot. Summ. J. at 15, ECF No. 59.)  As such, "there is literally no 'extension

---

[3] (*See* Mot. Summ. J. at 14-15, ECF No. 59.)

arm' present in the accused Ouroboros devices." (*Id.*)

Mad Catz responds that the "extension arm" of both Claims 1 and 2 is present in the Ouroboros devices and is situated in the area on the underside of the larger component (the computer mouse) of each version of the accused devices, outlined in red below:



**FIGURE 7[4]**

Razer replies that the red areas identified by Mad Catz are not the required extension arms of Claims 1 and 2 because both claims require that (1) "the extension arm not be part of the computer mouse" and (2) that the extension arm "extend outwardly from, or be located outside of, the rear of the computer mouse." (*Id.* at 15-16.) Defendant contends that the alleged "extension arms" are instead "part of the computer mouse" and "not located outwardly from the mouse" but rather "entirely ***within*** a section of the mouse that is ***between*** its center section and its rear." (*Id.* at 16 (citing Bear Decl. ¶¶ 41-44, ECF No. 59-13).) Razer argues that the areas Mad Catz identifies as "extension arms" are between the center and rear of the mouse:

---

[4] Diagrams copied by Razer from Mad Catz' AIC (AIC, Ex. A at 3-4, 16-17, ECF No. 59-4), with the label and green arrows added by Razer. (Mot. Summ. J. at 15, ECF No. 59.)



**FIGURE 8**[5]

Razer argues that no reasonable jury could find literal infringement because Mad Catz has failed to establish that the accused devices have "extension arms" as required by both Claims 1 and 2.

Mad Catz responds that a reasonable jury could or would necessarily conclude that the accused devices include "extension arms" based on the Court's proper construction of certain terms and an instruction that plain and ordinary meaning controls as to others. (Opp'n at 9, ECF No. 62.)

The Court finds that the accused devices do not include an "extension arm" that literally meets the requirements for the "extension arm" of either Claim 1 or 2.  The areas that Mad Catz identifies as "extension arms" are attached to and form a part of the "computer mouse."   In addition, the areas identified by Mad Catz as "extension arms" do not extend, at all, outwardly from the rear of the computer mouse or between the rear of the computer mouse and the ergonomic extension.

The Court's construction order found that the "ergonomic extension," which includes the "extension arm," is separate from the computer mouse as both of those objects are listed as separate elements comprising the "computer pointing device" in Claim 1, and

---

[5] (*See* Mot. Summ. J. at 16, ECF No. 59.)

that the claim language stating that the "extension arm" is 'fixed to the computer and extend[s] outwardly therefrom further indicates that the "computer mouse" does not itself include the "extension arm." (Order at 6, ECF No. 58.) With respect to Claim 2, the Court also determined that the claim language stating that the "extension arm" "extend[s] between the computer mouse and the ergonomic extension" further indicates that the "computer mouse" does not itself include the "extension arm." (*Id.* at 9.) Both construed claims provide that the "computer mouse" does not itself include the "extension arm."[6] Here, the "computer mouse" of the accused device includes the "extension arm"[7] and, therefore, the two components are not separate from each other as required.

Next, the specification and claim language requires that the ergonomic extension supports the palm and/or wrist, and that the buttons on the computer mouse are positioned at the front. Based upon this language, the Court found that, a person of ordinary skill in the art ("POSITA") would limit the term language to mean that the extension arm is fixed to the rear of the computer mouse. (Order at 7, 9-10, ECF No. 68.) The Court construed the position of the extension arm in reference to the "rear" of the computer mouse in both claims ("fixed to the **rear** of [the] computer mouse and extending outwardly therefrom" in Claim 1 and "extending between the **rear** of the computer mouse and the ergonomic

---

[6] The Court adopts the definition of "fixed" to mean "not adjustable," "permanently and definitively located," "stationary," and "immovable" (Block. Decl. ¶ 2; Ex. 8 definition 1a) and agrees with Razer that the plain meaning of the term "fixed" connotes that the extension arm and computer mouse must have at some point "existed as individual, physically-separate elements." (*See* Mot. Summ. J. at 14, ECF No. 59.) However, the Court rejects Razer's contention that the Court's construction necessarily requires that the "computer mouse," the "ergonomic extension," and the "extension arm" have to be three separate pieces, at least with respect to Claim 1. For example, the limitations of Claim 1 allow for the extension arm to be attached to the ergonomic extension and therefore not exist as an "individual, physically-separate element." Nonetheless, the Court's interpretation of both claims requires that the "computer mouse" not itself include the "extension arm."

[7] The Court agrees with Razer that a POSITA would understand the plain and ordinary meaning of "extension arm" in the context of this patent to mean a structure that provides additional length to the mouse. That Razer's proposed definition of "extension" as "a part that is extended from or attached to a main body or section as an addition, supplement, or enlargement . . . a section that forms an additional length" (Block Decl., Ex. 5) is exemplified by an extension "for an electric-light cord" (*id.*) is not "inappropriate" as urged by Mad Catz as the application is analogous to this context.

16

extension" in Claim 2).  (*Id.* at 8, 10.)  In this case, the alleged extension arms of the accused devices are underneath the computer mouse between the middle and rear of the computer mouse and not at the rear of the computer mouse.

Further, Claim 1 requires "an extension arm fixed to the rear of [the] computer mouse and extending outwardly therefrom."  (Order at 8, ECF No. 58.)  The two sections outlined in red identified by Mad Catz as being the "extension arm" are plainly located underneath the computer mouse.  The Court finds that a POSITA would find the plain and ordinary meaning of "outwardly" to mean "toward the outside: in an outwardly direction" (Block. Decl, Ex. 6 definition 1b) and "therefrom" to mean "from that: from it" (*id.*, Ex. 7)—in this context with reference to the "rear of the computer mouse."  The Court's other constructions and the plain meaning of the phrase "extending outwardly therefrom" connotes an extension arm fixed to the rear of the computer mouse that extends from the rear of the mouse in an outwardly direction from the rear of the mouse.  Upon review of the diagrams of the accused devices and expert testimony provided by both parties, the Court concludes that a POSITA would not find any structure fixed to and extending from the rear of the Ouroboros mouse in an outwardly direction.

Finally, a review of the specifications and diagrams of the '370 Patent provides additional support for the above interpretation of the term "extension arm."  For example, Figure 5 of the patent shows a computer mouse which is separated from an ergonomic extension through an "extension arm" which extends from the rear of the depicted computer mouse to the ergonomic extension or between the rear of the depicted computer mouse and the ergonomic extension. ('370 Patent 4:28-35, ECF No. 1-2.)  Meanwhile, it is clear that the inventor and drafter of the '370 Patent knew how to describe a computer mouse that connected to an ergonomic extension using means other than an extension arm.  Claim 3 (depicted in Figures 6-10) provides for such a device and utilizes "guide means"— such as "a pair of slots that engage with corresponding extensions on wrist rest so as to guide movement of wrist rest into and out of mouse body" (similar to ones used on the Ouroboros)—in place of an "extension arm" to join the computer mouse and ergonomic

1    extension.  (*See id.* 5:30-35; 7:20-23.)

2         In light of the foregoing, the Court finds that Mad Catz has failed to establish that

3    the accused devices literally have an "extension arm" as disclosed in Claims 1 and 2 and

4    thus no reasonable jury could find literal infringement on this basis.  Razer's motion for

5    summary judgment as to literal infringement is **GRANTED**.

6                      **2.  Doctrine of Equivalents**

7         Razer contends that the accused devices do not include the required "extension arm"

8    limitations of Claims 1 and 2 under the doctrine of equivalents.  Mad Catz contends that

9    the section of the accused devices outlined in red (*see* Fig. 7, *supra* at 14) is the equivalent

10   to the claim limitation of an extension arm "because any differences between the

11   Ouroboros extension arm and that required by Claims 1 and 2 are insubstantial."  (Opp'n

12   at 14-15, ECF No. 62 (citing Hall Decl. ¶ 24, ECF No. 62-1).)  Mad Catz argues that "the

13   outlined portion of the accused Ouroboros performs the same function, in substantially the

14   same way to obtain substantially the same result as the extension arm of Claims 1 and 3."

15   (*Id.* (citing Hall Decl. ¶ 24, ECF No. 62-1).)

16        Whether an element of an accused product infringes under the doctrine of

17   equivalents depends on whether that component performs substantially the same function

18   as the claimed limitation in substantially the same way to achieve substantially the same

19   result.  *Ethicon Endo-Surgery, Inc.*, 149 F.3d at 1315.  While the doctrine of equivalents

20   does work to encompass equivalents that are not literally claimed within the patent, the

21   doctrine is not unbounded.  *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1366-57 (Fed. Cir.

22   1999).  There are limitations, and the limitations are questions of law.  *Id.* at 1367 (citing

23   *Warner–Jenkinson*, 520 U.S. at 39 n. 8). One of these legal limitations is preclusion of

24   applying the doctrine of equivalents where that application would vitiate a claim element.

25   *Id.* at 1367.

26        Indeed, while unquestionably retaining vitality, the doctrine of equivalents exists in

27   some tension with other core tenets of the patent law, perhaps most notably the requirement

28   that the patentee "particularly point[] out and distinctly claim [] the subject matter which

the applicant regards as his invention," 35 U.S.C. § 112 ¶ 2 (1994), and the function of patent claims to provide notice to competitors regarding the scope of the patent grant, *see United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 232 (1942) ("The inventor must inform the public . . . of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not." (internal quotations omitted)).   The "all elements rule" provides that the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation. *Warner-Jenkinson*, 520 U.S. at 29.   As provided by the Supreme Court, "if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further material issue for the jury to decide." *Id.* at 39 n. 8.   *See also Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005) (affirming finding of no infringement under the doctrine of equivalents where a claim limitation required a structure to be "mounted" but in the structure in the accused device was "unmounted").

The Court has determined that the "extension arm" is separate from the "computer mouse" in Claim 1 (Order at 6, ECF No. 58) and that the "computer mouse" does not itself include the "extension arm" in Claim 2 (*id.* at 6, 9.)   Thus, the limitation is binary in nature—either the extension arm is separate from the computer mouse or it is not.   *See Asyst Techs, Inc.*, 402 F.3d at 1195.   If it is not, it is not the extension arm contemplated by Claims 1 and 2.   Including a part of the computer mouse as an equivalent to the extension arm of Claims 1 and 2 would vitiate a claim limitation—the requirement that the extension arm be separate from or not a part of the computer mouse.   Therefore, Mad Catz cannot assert that what it calls the "extension arms" on the Ouroboros devices infringe as an equivalent to the extension arm disclosed in Claims 1 and 2.   Because this limitation precludes the application of the doctrine of equivalents, this Court does not need to reach the issue of whether the areas on the computer mouse Mad Catz calls "extension arms" are substantially similar to the extension arm of the patent.

However, even if the "all elements rule" did not apply, Mad Catz has nonetheless

failed to provide "particularized testimony and linking argument as to the 'insubstantiality of differences' between the claimed invention and the accused device . . . on a 'limitation-by-limitation basis'" required to support a finding of infringement under the doctrine of equivalents. *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) (holding that "generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice").

Here, Mad Catz devotes less than one page to its argument regarding why the accused devices include an extension arm under the doctrine of equivalents.  Far from relying on "particularized testimony and linking argument . . . on a 'limitation-by-limitation basis,'" *see id.*, Mad Catz relies on one paragraph in its expert's declaration.  Mr. Hall opines that the differences between the accused devices and the "extension arm" requirement of Claims 1 and 2 are insubstantial, a POSITA would conclude that the portions of the accused devices Mad Catz has identified as the "extension arm" are "at a minimum, equivalent to a claim limitation of an extension arm," and the identified portions "perform[] substantially the same function in substantially the same way to obtain substantially the same result as the extension arm of Claims 1 and 2."  (Hall Decl. ¶ 24, ECF No. 62-1.)  The Court finds that such generalized testimony is insufficient to create a genuine issue of material fact on the issue of infringement under the doctrine of equivalents.  Nor can Mad Catz rely on its expert's literal infringement testimony (*see, e.g., id.* ¶¶ 11, 13, 16-23) to establish a genuine issue of material fact as to infringement under the doctrine of equivalents.  *See Texas Instruments Inc.*, 90 F. 3d at 1567 (finding expert testimony solicited for purposes of establishing literal infringement insufficient to establish infringement under the doctrine of equivalents); *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan*, 873 F.2d 1422, 1425 (Fed. Cir. 1989) ("The evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal

infringement.").[8]

In sum, Mad Catz has failed to establish a genuine issue of material fact on the issue of infringement under the doctrine of equivalents with respect to the "extension arm" limitations of Claims 1 and 2.  Therefore, Razer's motion for summary judgment as to infringement by equivalents is **GRANTED**.

**B.     Lack "Notches on the Extension Arm"**

Razer argues that, even assuming that a reasonable juror could find that the Ouroboros devices, either literally or under the doctrine of equivalents, have "extension arms," no reasonable juror could find that the Ouroboros devices include a "plurality of notches on the extension arm" as required for the locking mechanism claimed in both Claims 1 and 2.  (Mot. Summ. J. at 22-26, ECF No. 59.)  Mad Catz maintains that a reasonable jury could, or would, find that the Ouroboros either literally or under the doctrine of equivalents include "notches on the extension arm."  (Opp'n at 15-19, ECF No. 62.)

Having concluded that the accused devices do not include the "extension arm" limitations of Claims 1 and 2 and that, therefore, Razer is entitled to summary judgment of non-infringement, the Court need not address Razer's independent ground for finding of non-infringement based on the "notches on the extension arm" limitations of Claims 1 and 2.

//

//

---

[8] Razer also argues that in addition to lacking an "extension arm," the Ouroboros devices lack three additional elements of Claims 1 and 2 both literally and under the doctrine of equivalents: (1) the "slot in the ergonomic extension adapted to receive the extension arm for slidable movement of the extension arm therein" ('370 Patent Abstract 6:34-26; 6:62-64, ECF No. 1-2); (2) "locking means for releasably locking the extension arm in [at] any of a plurality of positions in the slot" (*id.* 6:37-39; 6:65-66); and (3) "a plurality of notches on the extension arm" (*id.* 6:43-44; 7:5-6).  (Mot. Summ. J. at 21, ECF No. 59.) Having found that the accused devices lack the required extension arm both literally and under the doctrine of equivalents, the Court need not address Defendant's additional cursory argument regarding the extension arm.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

Having found that Razer does not infringe the '370 Patent literally or under the doctrine of equivalents, the Court **GRANTS** Razer's motion for summary judgment of non-infringement of Claims 1 and 2 of the '370 patent.

**IT IS SO ORDERED.**

Dated:  December 8, 2015

Hon. Gonzalo P. Curiel
United States District Judge

3:13-cv-2371-GPC-JLB